THE STATE OF KANSAS, *ex rel. S. B. Bradford, Attorney General*, v. C. C. MILLS, *as Sheriff of Hamilton County.*

HAMILTON COUNTY; *Kendall, not Syracuse, the Temporary County Seat.* Upon the evidence introduced in this case, it is found and *held*, that at the election held in Hamilton county on November 2, 1886, the town of Syracuse did not receive a majority of all the legal votes cast in that county for the county seat; and therefore, *held*, that the town of Syracuse was not chosen as the permanent county seat of the county, and that the town of Kendall still remains the temporary county seat.

*Original Proceedings in Mandamus.*

THE opinion herein, filed at the session of the court in April, 1888, contains a statement of the facts.

*S. B. Bradford,* attorney general, for The State; *L. J. Webb,* and *E. A. Austin,* of counsel.

*Rossington, Smith & Dallas, Johnson & Cutlip, J. J. Milliken,* and *Milton Brown,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This is an action of mandamus, brought originally in this court on November 27, 1886, in the name of the state of Kansas, upon the relation of the attorney general, against C. C. Mills, as sheriff of Hamilton county, Kansas, to compel the defendant to hold his office at the town of Syracuse, which is alleged to be the county seat of said county. It appears that the county of Hamilton was organized on January 29, 1886, and the first election therein was held on April 1, 1886. At this election no place received a majority of the votes cast for county seat, and therefore no place was chosen as the permanent county seat of the county. For a full report of this election, see the case of *The State, ex rel., v. Comm'rs of Hamilton Co.,* 35 Kas. 640. At the general election held on November 2, 1886, the question as to where the permanent county seat of Hamilton county should be located was again voted upon by the electors of that county. This election was also for all state, county and township officers, and for some other things. Returns of this election were duly made and a canvass thereof was duly had, except as hereafter stated. The result of the canvass, as stated by the county commissioners and the county clerk, in tabular form, is as follows:

STATE OF KANSAS, HAMILTON COUNTY, ss.:

The following is an abstract of the votes polled at the several voting precincts of Hamilton county, Kansas, at an election held on November 2d, 1886, for the permanent location of the county seat, by virtue of the organization of said county, and in pursuance with the proclamation of the board of county commissioners of said county, under statutes in said cases made and provided, for the permanent location of the county seat. Said abstract was made from the official canvass of said

The State, *ex rel.*, v. Mills, *Sheriff.*

votes, at the court room in the town of Kendall, the temporary county seat of said county, on Friday, November 5th, 1886:

| VOTING PRECINCTS. | Coolidge.... | Kendall.... | Johnson City.... | Syracuse.... | Goguac.... | Kearney.... | Hartland.... | Grand total. |
|---|---|---|---|---|---|---|---|---|
| Coolidge township | 195 | 1 | | 24 | | | | |
| Grant township, Surprise precinct | | | | 66 | 1 | | | |
| Ulysses precinct | 5 | | | 92 | | | | |
| Shockeyville precinct | 3 | 119 | 4 | 19 | | | | |
| Golden precinct | 1 | 37 | 1 | 24 | | | | |
| Hartland township, Hartland precinct | 5 | 26 | | 79 | | | 1 | |
| Hoover precinct | 15 | 10 | | 36 | | 1 | 1 | |
| Kendall township, Kendall precinct | | 144 | | 2 | | | | |
| Coomes precinct | | | | | | | | |
| Stanton township | | 42 | 88 | 108 | | | | |
| Syracuse township | | 11 | | 335 | | | | |
| Totals | 224 | 390 | 93 | 785 | 1 | 1 | 2 | 1,496 |

We, the commissioners of Hamilton county, Kansas, hereby certify that the above is a true and correct abstract of the votes cast at said election for the permanent location of the county seat, as shown by the canvass of the votes as aforesaid, as returned by the election boards of the several precincts in said county; and we hereby further certify that Syracuse, having received a majority of all the votes cast in said county at said election for the permanent location of the county seat, wherefore we hereby declare said Syracuse to be the permanent location of the county seat of Hamilton county.

Attested: L. C. SWINK,

W. H. D. SHOCKEY,

Attested: THOS. H. FORD,    T. J. BARTON,

*County Clerk.*    *Commissioners.*

It is admitted that this statement of the canvass shows the correct vote in all the townships and precincts in the county, except the vote in Coomes precinct and the vote in Syracuse township. From this statement it appears that the returns from Coomes precinct, which the defendant claims gave Kendall 85 votes and Syracuse 6, and which the plaintiff admits gave Kendall 65 votes and Syracuse 6, were not canvassed at all; and it is further claimed by the defendant that at least 21 illegal and fraudulent votes were returned from Syracuse township. We shall consider these matters in their order.

It is admitted by both parties that a legal and valid election was held in Coomes precinct, and that returns thereof were

duly and legally made out, signed, sealed, etc., but what then became of such returns is a disputed question. They cannot now be found. A package of papers, however, purporting to be the election returns from Coomes precinct, was duly delivered by William C. Spaulding, one of the judges of the election, to Thomas H. Ford, the county clerk of Hamilton county, but whether it was the true election returns from that precinct, or not, is disputed. Afterward a package of papers, which also purports to be the election returns from that precinct, but which returns are admitted to be forgeries, was found in the possession of the county clerk, which package he claims is the same package that was originally delivered to him by the judge of the election as the election returns from Coomes precinct, but which package the defendant and the aforesaid judge of the election at Coomes precinct claim is not. These forged returns are made out upon printed blanks, precisely like the blanks used for the other election returns of that election, and are in form precisely the same as all the genuine returns of that election are. As to when or where these forged returns were forged and substituted for the genuine returns, whether before or after the time when the county clerk received the supposed genuine returns from one of the judges of the election, and by whom the forgery was committed, are disputed questions, and we think, under the evidence in the case, are wholly immaterial, and we shall not attempt to decide them. These forged returns show that at Coomes precinct 91 votes were cast for the county seat, of which Kendall received 85 votes and Syracuse received 6 votes; and from the evidence in this case, and aside from these returns, and without reference to whether they show the correct vote with reference to the state, county or township officers, or not, we are inclined to think they show the correct vote with reference to the county seat. There was much evidence introduced on the trial tending to show that before the election was had, and even before Coomes precinct was created, it was the intention of the persons directing the affairs of Hamilton county to put obstacles in the way to prevent the people living in the territory which

is now known as Coomes precinct, from having a full, fair, and free election. That precinct was created out of territory belonging to Kendall township, and it is still a part of Kendall township. It was known before the precinct was created that the people living in that territory were favorable to Kendall as the county seat; while the county commissioners and the county clerk were hostile to Kendall and strong partisans of Syracuse. There was evidence introduced tending to show that Coomes precinct was secretly created just before the election, and without any petition from the voters thereof or any notice to them; and the place for holding the election was located at the residence of T. V. Coomes, a strong partisan of Syracuse, nearest to Syracuse, remote from the center of the precinct, and also remote from the center of the population thereof, and at a very inconvenient place for the attendance of the voters; and three persons, hostile to Kendall and friendly to Syracuse, of whom T. V. Coomes was one, were secretly, illegally and without authority of law appointed to register the voters of that precinct. We think, however, that the people of the precinct, by their own vigilance and good sense, held a legal and valid election; and we are inclined to think that 91 votes were cast in that precinct for the county seat, of which the town of Kendall received 85 votes and the town of Syracuse received 6 votes. All the judges of the election in that precinct and one of the clerks so testified, and they testified that the true, genuine and original election returns from that precinct so showed. Coomes, however, who was the other clerk of that election, and two other persons, testified that only 71 votes were cast for the county seat in that precinct, of which Kendall received 65 votes and Syracuse 6, and that the genuine returns so showed. The testimony of all these persons, and on both sides, corresponded precisely with their preferences for the county seat. There was some corroborating testimony on both sides. On the side that there were only 71 votes cast at that election, was the current rumor to that effect immediately after the election, both at Syracuse and at Kendall. On the side that there were more than 71

votes cast at that election, is the following: The testimony of
various witnesses was introduced, clearly showing that more
than 71 electors of that precinct — and their names are given by
the witnesses — were actually present at the polls at that election
and voted.    Indeed we think it was fairly shown by such evi-
dence that 82 electors of that precinct — and their names are
given — were present at the polls at that election and voted.
There were 112 registered voters in that precinct.    Taking
this evidence, and the evidence of the judges and one of the
clerks of the election tending to support the defendant's side
of the case, and all the evidence on the plaintiff's side, we
think the weight of the evidence preponderates in favor of
the theory that 91 electors were present at the polls at that
election and voted, and that Kendall received 85 of their votes
and Syracuse 6.    We might say here, however, that we have
not given all the evidence on either side of this question.    It
is too voluminous to give in this opinion.

It is also claimed that 21 illegal and fraudulent votes were
polled in Syracuse township.    This is very nearly, if not en-
tirely true; and yet this election in Syracuse township is fair
and honest when compared with the election in that same town-
ship held on April 1, 1886.    The returns of the election held
on April 1, 1886, showed that 1,178 votes were cast in Syra-
cuse township, and all for the town of Syracuse for the county
seat except two, (35 Kas. 642;) while at this election the re-
turns show that only 346 votes were cast in Syracuse township,
and that 11 thereof were cast for Kendall and 335 thereof
for Syracuse.    The territorial boundaries of Syracuse township
were precisely the same at the second election as they were at
the first.    Of these 335 votes which were cast for Syracuse
in Syracuse township, it is claimed by the defendant that at
least 21 are illegal and fraudulent, and we think the claim is
substantially correct.    The election in Syracuse township was
held at the town of Syracuse, and during all the fore part of
the day T. G. Cutlip, who was friendly to Kendall, stood at
the polls of Syracuse to detect and prevent fraud, and during
that time the election was conducted with reasonable fairness

6 — 39 KAS.

and honesty; but between 3 and 4 o'clock in the afternoon he left Syracuse and went to Kendall, and immediately thereafter the alleged fraudulent voting commenced at Syracuse. In some cases two fraudulent votes of well-known persons, absent from Syracuse, were polled at the same time. A vote was polled in the name of C. A. Cordes, a man who had been a prominent merchant in Syracuse, but had recently failed and was then at Kansas City, Missouri. The next vote polled was a vote in the name of C. H. Dye, a prominent citizen and business man of that place, who was then at Bowling Green, Kentucky, for the purpose of getting married. A vote was also polled in the name of William E. Moore, a son of one of the present acting county commissioners. William E. Moore was taken sick and was not at the polls at any time during that day. A vote was also polled in the name of John Carmody, who was absent in Iowa on that day and voted in that state. Votes were also polled in the names of John Sawyer and C. W. Wiley, who were residents of Morton county and voted in Morton county, and did not vote in Hamilton county. A vote was also polled in the name of J. V. Ratliff, who was in Elk county at the time and was not a resident of Syracuse township. A vote was also polled in the name of Thomas Winn, who was a resident and voter of Hartland precinct, and voted in Hartland precinct and not at Syracuse. A vote was also polled in the name of C. I. Moon, who was then at Los Angeles, California. A vote was also polled in the name of Jackson Wood, a resident of Iowa, who probably did not vote at all, but who was then in Syracuse, and was the father of one of the clerks of the election. A vote was also polled in the name of H. R. McPherson, who was not in Syracuse that day, and had not been for a long time, but was somewhere in the east. A vote was also polled in the name of D. E. Halleck, who was then, and had been for a long time, at Long Island, N. Y. A vote had previously been polled in the name of J. A. Wiley, a resident of Morton county, but finally his name was scratched out and the name of D. E. Halleck was written over it. A vote was also polled in the

name of Paris Mills, who did not vote at that election, but was at the time in Chase county, Kansas. Votes were also polled in the names of E. R. Good, J. S. Jones, H. E. Barnes, E. C. Downs, Dan. Reinhardt, Ira Evans, and J. F. Evarts, which votes were shown to be illegal. Indeed, the votes of at least 21 persons which are claimed to be illegal and fraudulent were polled at that election. It is possible that the vote of one of these 21 persons, Dan Orr, was legal. It is suggested, however, by the plaintiff, that as 11 of the votes which were polled at Syracuse were counted for Kendall, these 11 votes counted for Kendall may have been 11 of the illegal and fraudulent votes that were polled in Syracuse. This can scarcely be possible, and yet if it were entirely true it would make no difference so far as this case is concerned. All the judges and the clerks of the election at Syracuse were friendly to Syracuse and hostile to Kendall, and nearly all the people at that place were also in that same condition and on the same side, and they certainly would not have permitted illegal or fraudulent votes to have been cast for Kendall. It is not possible to suppose that the judges and the clerks and the bystanders at that election would have permitted such fraudulent votes to have been polled for Kendall as were polled in the names of such well-known persons as C. A. Cordes, C. H. Dye, and several other persons who at that time were absent from Syracuse and from Hamilton county. Would they have permitted a fraudulent vote to have been polled for Kendall in the name of the father of one of the clerks of the election? Would they have permitted a fraudulent vote to have been polled for Kendall in the name of a son of one of the present acting county commissioners? Undoubtedly every fraudulent vote polled at that election was polled and counted for Syracuse. If the judges and the clerks were alone the authors of these fraudulent votes, then of course they knew that such votes were polled and counted for Syracuse. But if some person or persons pretended to represent the absent persons, and actually voted these fraudulent votes, still, both the judges and the clerks and also the bystanders must have known it, and must have known

that the votes were cast for Syracuse. It would require too great a stretch of credulity to believe otherwise. The persons in whose names nearly all these fraudulent votes were polled cannot testify with reference to what place these votes were intended to be counted for the county seat, for such persons were not present at the election and did not cast such votes. And further, it can hardly be supposed that the judges and the clerks of the election at Syracuse could be so innocently mistaken with regard to these illegal and fraudulent votes as to think that they were in fact legal and valid votes. They could not have supposed that C. A. Cordes, who had formerly been a prominent merchant of that place, and C. H. Dye, a prominent citizen and business man of that place, and William E. Moore, a son of one of the present acting county commissioners, and several other persons whom we might mention, who were not at or near the polls at any time during the day of the election, had actually come in person to the polls and had actually voted; and it can hardly be supposed that Jackson Wood was not known by his son, who was one of the clerks of the election. However, we think it is immaterial for the purposes of this case whether the judges and the clerks of the election knowingly participated in these frauds, or not, for in any case it is clear that the town of Syracuse did not receive a majority of the legal votes cast at that election. The canvass of the board of county commissioners shows that Syracuse received 785 votes, and that the other places received 711 votes. Now if we add to the 785 votes which the canvass shows were received by Syracuse, the six votes cast for Syracuse in Coomes precinct, and deduct 20 votes for the illegal and fraudulent votes cast for Syracuse in Syracuse township, it will leave 771 votes as cast for Syracuse. And if we add to the 711 votes which the canvass shows were received by the other places, the 85 votes cast for Kendall in Coomes precinct, it makes the votes received by the other places 796, or 25 votes more than were received by Syracuse, and this is probably about the correct result of the election. This count may not be absolutely correct, and yet we think it is proxi-

The State, *ex rel.*, v. Comm'rs of Hamilton Co.

mately so. The majority may be more or less against Syracuse, and for the other places; but in whatever way we may reasonably view this case under the evidence, Syracuse did not receive a majority of the legal votes cast at that election in Hamilton county. Nor did any other place. Therefore, under the evidence and the statutes, no place was chosen to be the permanent county seat of Hamilton county, and therefore Kendall still remains the temporary county seat of the county, and hence the defendant, C. C. Mills, is not illegally holding his office of sheriff at Kendall.

*Kendall, not Syracuse, the temporary county seat of Hamilton county.*

The judgment of this court will be in favor of the defendant, Mills, and against the plaintiff.

All the Justices concurring.